**Affirmed and Opinion Filed September 8, 2020**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-20-00055-CV**

**IN THE INTEREST OF S.B. & S.B., MINOR CHILDREN**

**On Appeal from the 305th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. JC-12-1096-X**

## MEMORANDUM OPINION

Before Justices Osborne, Partida-Kipness, and Pedersen, III
Opinion by Justice Pedersen, III

The mother of S.B. and S.L.B. ("Mother") appeals the termination of her parental rights to S.B., a ten-year-old girl, and S.L.B., a seven-year-old girl. Following a bench trial, the trial judge found that Mother had constructively abandoned her daughters and that termination of Mother's parental rights was in the best interest of S.B. and S.L.B under Texas Family Code § 161.001(b)(1)(N). For the following reasons, we affirm the judgment of the trial court.

### I. BACKGROUND

Since late 2013, S.B. and S.L.B. resided with Isabel Brown. The Texas Department of Family and Protective Services ("Department") removed the children

from Mother and placed them with Brown, who served as Joint Permanent Possessory Conservator. In November 2015, Brown was appointed Permanent Managing Conservator after the parties entered a mediated settlement agreement. During the years that S.B. and S.L.B. lived with Brown, Mother was a Permanent Possessory Conservator, and her possession schedule allowed supervised visitation with S.B. and S.L.B.

On August 8, 2019, Brown delivered S.B. and S.L.B. to the Department and relinquished her rights as conservator. In an affidavit, Brown stated that she could no longer care for the girls due to Mother's erratic behavior, which caused her, S.B., and S.L.B. to be at risk. On August 9, 2018, the Department filed its motion to modify the prior orders in the suit affecting the parent-child relationship and for termination of parental rights with respect to both S.B. and S.L.B.

On August 10, 2018, the trial court entered an ex parte order "that the [Department] be appointed temporary managing conservator of the children, limited to possession, custody, and control and the responsibility to determine [their] placement." After an extension of this ex parte order, the trial court entered a temporary order on September 5, 2018, appointing the Department as temporary managing conservator of the children "with possession and authority to consent to medical care." These temporary orders also granted Mother periods of supervised visitation with S.B. and S.L.B. "as arranged by the parties," to occur at locations that the Department directed. These temporary orders on visitation continued through the

end of trial. Over the course of the proceedings, the father of S.B. relinquished his parental rights, which were thereafter terminated. The father of S.L.B. was properly served but failed to answer or appear; his parental rights were terminated by default.

The trial court held a two-day bench trial on July 30, 2019, and October 17, 2019. The trial court heard testimony from Sherry Williams (investigative supervisor), Isabel Brown, Stephanie McVea (Mother's therapist), Denice Robinson (children's therapist), Annette Thomas (visitation supervisor), Scarlet Cavazos (conservatorship worker), Melinda Fain (children's Court Appointed Special Advocates ("CASA") advocate), and Dorothy Chatmon (foster parent for S.L.B.). Mother did not testify or provide evidence at trial.

The trial court rendered judgment terminating Mother's parental rights to the children, finding constructive abandonment by Mother. After the decree of termination was entered in December 2019, Mother appealed, raising a single issue: whether the evidence before the trial court was legally sufficient and factually sufficient to support the trial court's finding that Mother constructively abandoned S.B. and S.L.B.

## II. STANDARD OF REVIEW

"We review a trial court's findings of fact under the same legal and factual sufficiency of the evidence standards used when determining if sufficient evidence exists to support an answer to a jury question." *Sheetz v. Slaughter*, 503 S.W.3d 495,

502 (Tex. App.—Dallas 2016, no pet.) (citing *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994)).

Proceedings involving termination of parental rights under the Texas Family Code require proof by clear and convincing evidence. TEX. FAM. CODE § 161.001(b); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). "Clear and convincing evidence is 'proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *In re J.O.A.*, 283 S.W.3d at 344 (citing TEX. FAM. CODE § 101.007; quoting *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002)). The heightened clear and convincing evidentiary standard applies in termination of parental rights cases because such cases involve fundamental interests. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014); *see In re G. M.*, 596 S.W.2d 846 (Tex. 1980).[1] In legal and factual sufficiency review of an order terminating parental rights, we must "consider all the evidence to determine whether the fact-finder could reasonably form a firm belief or conviction that the grounds for termination are proven." *In re J.D.B.*, 435 S.W.3d 452, 462 (Tex. App.—Dallas 2014, no pet.). (citing *In re J.F.C.*, 96 S.W.3d 256-66).

In evaluating the evidence for legal sufficiency in a parental termination case, we view the evidence in the light most favorable to the finding and "'consider all the

---

[1] The fundamental liberty interest of a parent in the care, custody, and control of her child is one of constitutional dimensions; accordingly, involuntary parental termination must be strictly scrutinized. *In re C.J.B.*, No. 05-19-00165-CV, 2019 WL 3940987, at *5 (Tex. App.—Dallas Aug. 21, 2019, no pet.) (citing *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000); *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)).

evidence, not just that which favors the verdict.'" *Id.* (quoting *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005)). In our legal sufficiency review, we assume the fact-finder resolved disputed facts in favor of its finding—if a reasonable fact finder could do so—and we disregard all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible. *Id.* at 463.

In evaluating the evidence for factual sufficiency in a parental termination case, we consider and weigh all of the evidence; "[w]e give due deference to the decisions of the fact-finder because the fact-finder is the sole arbiter when assessing the credibility and demeanor of witnesses[;] and [we] do not supplant the judgment with our own." *Id.* (citing *In re A.B.*, 437 S.W.3d at 502–03). Based on the entire record, we determine whether the evidence is such that a fact-finder could reasonably form a firm conviction or belief about the truth of the allegations against the parent. *Id.* (citing *In re A.B.*, 437 S.W.3d at 502-03).

## III.   CONSTRUCTIVE ABANDONMENT

Texas Family Code section 161.001(b) allows involuntary termination of parental rights if clear and convincing evidence supports that (i) a parent engaged in at least one of the twenty-one enumerated grounds for termination and (ii) termination is in the best interest of the child. *See* TEX. FAM. CODE § 161.001(b)(1)(A)-(U), (b)(2); *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019). "A termination decree is final and irrevocable, divesting for all time that natural right as well as all legal rights, privileges, duties, and powers between the parent and child

except for the child's right to inherit." *In re M.K.*, No. 05-18-01297-CV, 2019 WL 2283886, at *3 (Tex. App.—Dallas May 29, 2019, no pet.) (mem op.).

Here, in addition to finding that termination of parental rights was in S.B. and S.L.B.'s best interest, the trial court terminated Mother's parental rights under one ground: Texas Family Code section 161.001(b)(1)(N), which provides that a court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has:

> constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and:
>> (i) the department has made reasonable efforts to return the child to the parent;
>> (ii) the parent has not regularly visited or maintained significant contact with the child; and
>> (iii) the parent has demonstrated an inability to provide the child with a safe environment;

TEX. FAM. CODE § 161.001(b)(1)(N).

Here, it is undisputed that the children have been in the temporary managing conservatorship of the Department for not less than six months. Mother specifically challenges the legal and factual sufficiency of the evidence regarding the three remaining elements under section 161.001(b)(1)(N), which we address hereunder.[2]

---

[2] We note that Mother did not appeal whether evidence was sufficient to support a finding that termination was in the best interest of the children, and we offer no opinion or analysis on that element.

*i.*   *The Department's Reasonable Efforts to Return the Children to Mother*

Mother contends that the evidence does not support a finding by clear and convincing evidence that the Department made reasonable efforts to return the children to her. *See* TEX. FAM. CODE § 161.001(b)(1)(N)(i).[3] However, the evidence shows that the Department implemented a family service plan that provided services to Mother and was designed to reunify Mother with the children. *See Liu v. Dep't of Family & Protective Servs.*, 273 S.W.3d 785, 795 (Tex. App.—Houston [1st Dist.] 2008, no pet.) ("A family service plan is designed to reunify the parents with their children who have been removed by DFPS."). "[A] family service plan by [the Department] is considered a reasonable effort to return a child to the parent." *In re R.P.D.*, No. 05-19-00258-CV, 2019 WL 1578274, at *2 (Tex. App.—Dallas Apr. 12, 2019, no pet.) (mem. op.).[4]

---

[3] Mother points to the fact that she had actual possession of two of her other children for a number of months prior to the hearing in this case. Her possession of those children is not relevant to the charge that she abandoned S.B. and S.L.B.

[4] In *In re R.P.D.*, we identified and summarized several cases with citations addressing the role of service plans in the Department's efforts to return a child to her parent. *Id.* ("*See e.g.*, *In re N.R.T.*, 338 S.W.3d 667, 674 (Tex. App.—Amarillo 2011, no pet.) (noting that there was evidence of service plans and TDFPS agreeing to home studies of family members as possible placements); *see also In the Interest of M.R.J.M.*, 280 S.W.3d 494, 505 (Tex. App.—Fort Worth 2009, no pet.) (the State's preparation and administration of a service plan for the parent constitutes evidence that the State made reasonable efforts to return the child to the parent, and noting State made special arrangements for father to have parenting classes in nearby town); *In re S.S.*, No. 11-05-00083-CV, 2006 WL 1285125, at *2–3 (Tex. App.—Eastland May 11, 2006, no pet.) (mem. op.) (evidence that TDFPS prepared service plans for the parent, arranged and paid for a psychological evaluation and a drug assessment, provided the parent with counseling and parenting classes, and scheduled regular visitation for the parent was legally and factually sufficient to show reasonable effort to reunite parent with child).").

The evidence shows that Mother received a copy of the family service plan, which included the following tasks and services:

> Domestic Violence Counseling: [Mother] will participate in domestic violence counseling to assist her with recognizing how violence in her relationship negatively impacts their family. …

> [Mother] is encouraged to attend Parents Empowering Parents …

> Psychiatric Evaluation: [Mother] will continue psychiatric treatment and evaluations to assess her ability to take responsibility for her children, provide safe and nurturing environment and alter pattern of behavior resulting in CPS involvement. [Mother] will follow all recommendations from the psychiatric and treatment plans including medication compliance. …

> Individual Counseling: [Mother] will complete individual counseling to develop coping skills and an understanding of how her interpersonal issues are affecting her family. [Mother] will follow any recommendations made by this provider.

The family service plan further detailed specific goals for Mother to accomplish:

> [Mother] will demonstrate the willingness and ability to protect her children from harm.

> [Mother] will demonstrate [an] ability to stay away from a drug and alcohol lifestyle.

> [Mother] will demonstrate [an] ability to secure basic necessities such as food, clothing, shelter, medical care, and supervision for the children.

> [Mother] will demonstrate [an] ability to protect the children from future abuse or neglect, [sic] and will show concern for [their] future safety.

> [Mother] will demonstrate an understanding of the cycle of violence/domestic violence and be proactive in securing safety for the family. [Mother] will demonstrate the ability to maintain supportive relationships that are beneficial to the family situation.

[Mother] will demonstrate an ability to change the pattern of behavior that resulted in abuse/neglect.

Although the record shows that Mother completed some domestic violence counseling, the record also shows that she did not understand how to properly parent her children and protect them from domestic violence situations. The record of Mother's therapy shows that, while Mother grew more open, honest, rational, and less aggressive with others, Mother never met her therapy goals of managing her children and remaining independent. McVea testified that Mother "could not follow through" on plans, and she would not recommend that the children be placed in Mother's care. McVea further testified that Mother did well with the children in a controlled environment but that:

> [Mother] pretty much functions in crisis mode usually. Usually she's responding to a crisis. So she will have this awesome plan to get out of a crisis and just ends up being [in] one crisis after another. So her skills to prevent those type of things just hasn't improved to where they needed to be.

Although there is evidence that Mother attended individual counseling, there is no evidence in the record that Mother completed any psychiatric evaluation.

In addition to the aforementioned services, the record shows that the Department provided Mother access to weekly visitation with the children in accordance with the temporary orders. *See H.N. v. Dep't of Family & Protective Servs.*, 397 S.W.3d 802, 810–11, (Tex. App.—El Paso 2013, no pet.) (holding that

access to weekly supervised position was evidence of Department's reasonable efforts to return a child).

Whether we view the evidence in the light most favorable to the trial court's finding or weigh all the evidence as it relates to this first contested element, the trial court could have formed a firm belief or conviction that the Department made reasonable efforts to return the children to Mother. *See M.R.J.M.*, 280 S.W.3d at 505; *R.P.D.*, 2019 WL 1578274, at *2. We conclude the evidence was legally and factually sufficient to support the trial court's determination that the Department made reasonable efforts to return the children to Mother. *See* TEX. FAM. CODE § 161.001(b)(1)(N)(i).

### ii. *Mother's Visitations and Significant Contacts with the Children*

Next, Mother contends that the evidence does not support a finding by clear and convincing evidence that she has not regularly visited or maintained significant contact with the children. *See* TEX. FAM. CODE § 161.001(b)(1)(N)(ii). Over fifty-eight weeks passed from the time of the entry of the temporary orders on visitation until the final day of trial. Although the record shows that Mother exercised her visitation of the children twenty times over the course of the termination proceeding, Cavazos testified Mother exercised visitation with the children a total of five times

in the nine-month period from February 2019 to October 2019.[5] Cavazos testified that Mother's reasons for missing visitations included:

> She had a doctor's appointment after giving birth to her newest child, her daughter. Once she told me she was working. And another, maybe two to three times, she told me that she didn't have child care for her other children.

Cavazos further testified that, prior to the birth of Mother's child in fall 2019, she missed visitations due to sickness during the pregnancy and, on one occasion, a hospitalization. There is evidence of a visitation that was scheduled in which the children were brought into the CPS office, but mother failed to appear. Although we recognize that it is not Mother's burden, the record contains no documentary evidence or firsthand evidence for any of Mother's excuses for missing visitations. *See generally* TEX. FAM. CODE § 161.001(b). The record contains neither evidence of Mother contacting the Department to schedule make-up visitation nor evidence of any communications between Mother and the children—such as letters, voicemails, phone call logs, emails, or text messages.

We have previously held that evidence of a parent missing 40% of his or her scheduled visitations over a seven-month period is sufficient evidence of that parent's not regularly visiting or failing to maintain significant contact with the child. *In re E.M.*, No. 05-18-01161-CV, 2019 WL 1449791, at *4 (Tex. App.—

---

[5] Although mother contends that she was bedridden during this time, we note that there is no testimony or documentary evidence supporting the allegation that Mother was bedridden during those months.

Dallas Apr. 1, 2019, no pet.) (mem op.). Similarly, the Fort Worth court of appeals has held that attending only twelve periods of possession over a nine-month period—during which visitations where scheduled weekly—constituted evidence supporting termination under constructive abandonment. *In re J.J.O.*, 131 S.W.3d 618, 629 (Tex. App.—Fort Worth 2004, no pet.).

We conclude that the testimony regarding Mother's excuses for missed visitations does not outweigh the evidence that Mother failed to regularly visit or maintain significant contact with her children. *See Interest of F.L.B., 13-19-00319-CV*, 2019 WL 6606159, at *8 (Tex. App.—Corpus Christi Dec. 5, 2019, no pet.) (mem op.) (holding that a Mother who exercised visitation twelve times over a three year period failed to regularly visit or maintain significant contact with her child despite her "proffered reasons for her repeated absence—prior work commitments, lack of transportation, unavailable child care, prioritization of her other children").

Whether we view the evidence in the light most favorable to the trial court's finding or weigh all the evidence pertaining to this second element, a reasonable fact-finder could have formed a firm conviction that Mother did not regularly visit or maintain significant contact with the children. *See id.* at 629-30; *In re A.B.*, 437 S.W.3d at 506; *In re E.M.*, 2019 WL 1449791, at *4. We conclude the evidence was legally and factually sufficient to support the trial court's determination on this element. *See* TEX. FAM. CODE § 161.001(b)(1)(N)(ii).

### iii. *Mother's Inability to Provide the Children with a Safe Environment*

Lastly, Mother contends that the evidence does not support a finding by clear and convincing evidence that she has demonstrated an inability to provide the children with a safe environment. *See* TEX. FAM. CODE § 161.001(b)(1)(N)(iii). In our review of whether a child's parents are willing and able to provide the child with a safe environment, we consider the factors listed in Texas Family Code § 263.307(b). *See* TEX. FAM. CODE § 263.307(b). The record contains evidence from several witnesses who raised concerns as to whether Mother could provide a safe environment for the children.

1. Age, physical, and mental vulnerabilities of the children

The Texas Family Code directs us to first consider the children's ages and their mental and physical vulnerabilities. *See* TEX. FAM. CODE § 263.307(b)(1). The record shows that both children—ten years old and six years old—were diagnosed with ADHD and exhibited behavioral problems that required therapy and medication. Fain testified that six-year-old S.L.B. suffers from a developmental delay—placing her on an academic level of a two-year old—and suggested that S.L.B. should attend a special needs school. Robinson testified that, although both children needed a stable home, S.L.B. in particular needed speech therapy, "structure as far as daily routines[,] and someone who is nurturing, who is going to … follow … through with any recommendations for treatment." Chatmon testified that S.L.B. (1) generally has behaviors of a three year old, (2) does not know her own body

–13–

parts, (3) needs assurances while dropped off at school and throughout the day that she (Chatmon) will be back to pick her up, and (4) "runs out of the classroom a lot because she has attachment [issues]" during school and "panics a lot." The record shows that Mother's failure to consistently exercise visitation with the children resulted in them exhibiting behavioral issues and depression.

With respect to ten-year-old S.B., Robinson testified that she has an adjustment disorder in addition to her ADHD diagnosis. Robinson testified that S.B. has aggression toward her sister. Chatmon testified that S.B. did not share the same foster home with S.L.B. because of "... [a]nger. [S.B.] has a lot of anger. There was a lot of violence towards [S.L.B.]. ... it's a lot of violence between [S.B.] and [S.L.B.]. Due to these issues and conflicts, the children are placed in different homes.

The record indicates that the children both have significant vulnerabilities. The record lacks evidence that Mother could meet S.B. and S.L.B.'s needs and support their vulnerabilities. Instead, witnesses testified to their concerns that Mother would not be able to support the children's special needs, discussed further hereunder. *See* TEX. FAM. CODE § 263.307(b).

2. Mother's History of Abusive or Assaultive Conduct

Another factor the Texas Family Code directs us to consider is whether there is a history of abusive or assaultive conduct by the child's family. *See* TEX. FAM. CODE § 263.307(b)(7). Mother suffered from bipolar disorder and schizophrenia, which required medication. Although mental illness alone is not sufficient grounds

–14–

for terminating the parent-child relationship,[6] "when a parent's mental state allows [her] to engage in conduct [that] endangers the physical or emotional well-being of the child, that conduct has a bearing on the advisability of terminating the parent's rights." *In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ) (discussing termination of parental rights in the context of a mother's schizophrenia and resulting suicidal thoughts, hospitalizations, and violence).

McVea testified that she began therapy with Mother in 2017, after a referral based on a verbal and physical altercation between Mother and Mother's aunt, which escalated to Mother's threatening her aunt with a knife. At that time, Mother was not on her medication and was pregnant. Similarly, before and during this termination proceeding, Mother was pregnant, and the record indicates that Mother did not take her medication while she was pregnant. The record shows that Mother is "able to get along and … be rational with people instead of being very aggressive" when she is on medication.

Brown testified to two specific incidents of Mother's behavior, which ultimately led Brown to relinquish her rights to S.B. and S.L.B. First, Brown testified that—while Brown and the children were at a grocery store—Mother saw S.B. and attempted to forcibly grab S.L.B. At that time, Mother had no right to possession of either child, but Mother nonetheless called for security and threatened to call the

---

[6] *In re S.R.*, 452 S.W.3d 351, 363 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). ("Mental illness alone is not grounds for terminating the parent-child relationship.")

police on Brown. Mother then left the store. Second, Brown testified that in August 2018, Mother brought five men to Brown's home, asking Brown to come outside to talk in the street. Brown testified Mother threatened her, stating that Mother "need[ed] to get with [her] because things wasn't right according to her girls." Brown called the police, and Mother then left with the five men.

### 3. Mother's Parenting Skills

The Texas Family Code further directs us to consider whether the child's family demonstrates adequate parenting skills. *See* TEX. FAM. CODE § 263.307(b)(12). Apart from evidence showing that Mother (a) never met therapy treatment goals of learning to manage her children and (b) failed to follow through on plans, several witnesses testified as to Mother's lacking parenting skills. Thomas (visitation supervisor) testified that she was concerned that Mother did not discipline or correct S.B. when S.B. used profanity with the one of the transporters in the lobby of the visitation premises. Thomas noticed that Mother spent time during the visitations on her phone, not interacting with the children. Thomas testified that Mother could not manage all of the children without S.B.'s help and that Mother would often grow impatient—yelling or raising her voice. Thomas testified that during the supervised visitation, Mother would threaten physical discipline, including raising her hand to strike. There is evidence that, historically, the Department has removed five of Mother's six children from her care.

McVea testified that Mother has a history of domestic violence and that Mother has experienced "so much abuse throughout her lifetime" that "she [doesn't] know how to get out of [it.]" McVea further explained that Mother minimized the abuse, and Cavazos testified that Mother is still in a relationship with the perpetrator of the domestic violence.

### 4. Safe physical home environment

Another factor that the Texas Family Code directs us to consider is whether the parent can provide the child with a safe physical home environment. *See* TEX. FAM. CODE § 263.307(b)(12)(D). We have previously held that a parent's inability to provide housing and "erratic employment" serves as evidence supporting constructive abandonment. *In re J.H.R.*, No. 05-01-00482-CV, 2002 WL 1129114, at *7 (Tex. App.—Dallas May 31, 2002, no pet.); *see also In re V.D.A.*, No. 14-14-00561, 2014 WL 7347776, at *9 (Tex. App.—Houston [14th Dist.] Dec. 23, 2014, no pet.) (mem. op.) (finding sufficient evidence of constructive abandonment when father did not provide proof of income or stable housing); *M.C. v. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 310 (Tex. App.—El Paso 2009, pet. denied) (finding sufficient evidence of constructive abandonment when mother failed to provide basic necessities for child and had no permanent housing or employment).

The record shows that Appellant did not have stable housing for herself, did not provide stable housing for the children, and never provided alternative placements for the children. Witnesses testified that Mother resided at multiple

locations: her adoptive mother's one-bedroom apartment, a domestic violence shelter, a motel, and other various places. McVea testified that she was unaware if Mother ever had stable housing and that "at no time during [McVea's] work with her did [Mother] ever have stable residence." Apart from Mother's excuse of missing visitation due to work, the record contains little evidence that Mother was employed. Sherry Williams testified that Mother had not held a steady job during the pendency of the case.

Whether we view the evidence in the light most favorable to the trial court's finding or weigh all the evidence on this third contested element, the trial court could have formed a firm belief or conviction that Mother demonstrated an inability to provide the children with a safe environment. We conclude the evidence was legally and factually sufficient to support the trial court's determination on this third element. *See* TEX. FAM. CODE § 161.001(b)(1)(N)(iii); *In re J.H.R.*, 2002 WL 1129114, at *7; *In re V.D.A.*, 2014 WL 7347776, at *9; *M.C*, 300 S.W.3d at 310.

## IV. CONCLUSION

We overrule Mother's sole issue. The trial court's judgment terminating Mother's parental rights is affirmed.

/Bill Pedersen, III//
BILL PEDERSEN, III
JUSTICE

200055f.p05

–18–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

In the Interest of S.B. & S.B

On Appeal from the 305th Judicial District Court, Dallas County, Texas Trial Court Cause No. JC-12-1096-X. Opinion delivered by Justice Pedersen, III. Justices Osborne and Partida-Kipness participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 8th day of September, 2020.